THE PEOPLE OF PUERTO RICO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, CAGUAS PART, FRANCISCO COLLAZO LIZARDI, JUDGE, Respondent; FIDELINA SANTANA, Intervener.

No. O-67-22.      Decided April 15, 1970.

30

*J. B. Fernández Badillo, Solicitor General,* and *Ida Cardona Hernández, Assistant Solicitor General,* for petitioner. *Benigno Dávila* for intervener.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On December 21, 1965, Fidelina Santana filed a complaint in an action for divorce in the Caguas Part of the Superior Court. She alleged that she had lived for more than a year at the ward Santa Rosa in Dorado, and that defendant Ismael López lived in New York City; that the parties had contracted marriage in New York City on November 13, 1948; that there were two children 14 and 8 years old; that there was no community property, and as a cause for divorce she alleged that for more than three years the parties had lived and continued living in complete separation without any interruption.

On January 13, 1966, the Part ordered that defendant be summoned in New York by personal notice, which was served on January 19, 1966. On February 10, defendant's default was entered and on the following day the hearing of the case was held.

The pertinent part of the transcription of the hearing is as follows:

"Q. And do you live together or apart?
A. Apart.
Q. Where and when did you separate?
A. In the year 1958.
Q. Where?
A. In New York.
Q. And when did you come to Puerto Rico?
A. In November 1960.
Q. And where do you live?
A. At the Ward Santa Rosa, Dorado, Puerto Rico.
Q. Since you came to Puerto Rico, have you seen him sometime?
A. No.
Q. Was he in Puerto Rico not too long ago?
A. He was in Puerto Rico.
Q. Did you see him?
A. I did not see him.
Q. Did you try to see him?
A. Yes.
Q. What for?
A. To see if he would send something to the children.
Q. What is his line of work?
A. Preaching.
Q. In what church?
A. Pentecost.
Q. At what do you work here?
A. Sewing."

.    .    .    .    .    .    .    .

"Judge:
Q. Are two the children born during the marriage?
A. Two.
Q. How old are they?
A. Fourteen and eight years.
You may retire. The action for divorce is granted. The custody of the children born during the marriage is granted to plaintiff. An allowance for support to be paid by defendant is fixed at fifteen dollars ($15) weekly."

The decree was notified and filed on February 16, 1966.

On March 9, 1966, the District Attorney of Caguas appeared; he requested intervention and alleged that from an investigation made by the Office of the Prosecuting Attorney it appeared that none of the parties had the necessary residence or domicile in Puerto Rico pursuant to the law. He requested the court that once the intervention was permitted and those facts proven, to declare void the divorce decree.

The corresponding hearing having been held, the Caguas Part of the Superior Court on December 7, 1966 denied, by a grounded order, the Prosecuting Attorney's intervention. This order is the one which we are now reviewing.

Section 64 of the Political Code provides, as amended, that the Secretary of Justice shall represent the Commonwealth of Puerto Rico, either in person or through his assistants, or through any one of the prosecuting attorneys, in all suits and proceedings, civil and criminal, *to which it is a party*; and when requested by the Governor or any head of a department, he may also represent, before any court, any officer, employee or agent of the Commonwealth Government, suing or being sued in his official capacity; and it is provided that *public prosecutions for crime*, except in certain cases, will be instituted by the proper prosecuting attorney without special authorization from the Secretary of Justice, although in all such cases the Secretary of Justice may intervene in the public interest.

In addition to the general statement that permits the Secretary of Justice's intervention in all civil or criminal suits where the Commonwealth of Puerto Rico *is a party*, the laws authorize the intervention of the Secretary of Justice in the litigation of a series of specific cases, none of which includes an action for divorce.

Act No. 23 of July 24, 1952, created offices of Special Prosecuting Attorneys at Large, of Prosecuting Attorneys and of one Special Probation Officer for cases of minors, and provided that *the Prosecuting Attorneys* and the Assistant

Prosecuting Attorneys would have the powers and exercise the functions previously had and exercised by them or by officers of like category under authority of law up to the date said Act took effect, and the Special Probation Officer would have such powers and exercise such functions as were previously exercised by the Probation Officer for the Minor's Guardianship Court.

The Code of Criminal Procedure of 1902, 1935 ed., makes reference in its §§ 95 to 109 to the powers and duties of the prosecuting attorney, with certain amendments which have occurred subsequently. The Act of March 3, 1904—3 L.P.R.A. § 95—provides that it shall be the duty of every prosecuting attorney to prosecute all delinquents for crimes and offenses cognizable under the authority of the Commonwealth of Puerto Rico, *and all civil actions in which the Commonwealth of Puerto Rico is concerned* and shall perform all other duties conferred upon him by law, and commissions of the Secretary of Justice.

We know that the prosecuting attorney has traditionally had intervention by provision of law since the very beginning in a series of civil proceedings familiar to everyone, among which the lawmaker never included the action for divorce. Besides the District Attorney, there exists the Special Solicitor of the Family Relations Section of the Superior Court, an office created by Act No. 140 of April 23, 1952. By law he exercises the same powers and attributes as an assistant prosecuting attorney, except that he exercises them in relation with matters that he prosecutes or as the Judge of the Family Relations Section of the Superior Court may entrust to him pursuant to the law. These duties and functions of the Special Solicitor were expressly enumerated by Act No. 140, and the lawmaker did not grant this Special Solicitor of the Family Relations Section intervention in divorce cases.

■ Act No. 140 of 1952 was repealed by Act No. 75 of June 6, 1968, where the attributes of the Special Solicitor are

again enumerated, and neither gives him intervention in divorce cases. Under both statutes, however, the Solicitors shall cooperate with the Judges of the Superior Court in cases related with family matters as said judges may direct. Like the District Attorney, the Special Solicitor of the Family Relations Section is not authorized, on his own initiative, to intervene in divorce cases unless the Judge of Family Relations requests his cooperation in some aspect which the judge entrusts to him.

In the instant case it is not a question of the personal intervention of an officer who, believing to have powers therefor, requests to be heard in a litigation. As a question of reality what is involved is the intervention *of a party* in a suit, which in this case is the Commonwealth of Puerto Rico, and where the nullity of a judicial judgment which has created a state of law in favor of a litigant is requested. On the basis of *intervention of a party*, let us see Rule 21 of the Rules of Civil Procedure in relation to intervention.

Rule 21.1, intervention as a matter of right, provides that upon timely application anyone shall be permitted to intervene in an action (a) when *a statute* or these Rules confer *an unconditional right* to intervene; or (b) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant *is* or may be *bound* by a judgment in the action; . . . . In the light of the foregoing provision, the intervention requested in this case would not lie as a question of law.

As a permissive intervention under Rule 21.2, it is provided that upon timely application, anyone may be permitted to intervene in an action: (a) when *a statute* confers a conditional right to intervene; or (b) when an applicant's claim or defense and the main action have a question of law or fact in common.

■ It is unquestionable that in our society, and in past societies, there has always existed a public interest in the

preservation of marriage, angular stone of the family. Our Civil Code confers to the matrimonial contract a category of social institution. That general interest, however, does not make the State, whether in a procedural concept, or in a substantive manner, a litigant, sub silentio, in every action for divorce, in the absence of a positive provision of law which provides it thus. It is an historical fact that under the English Common Law, the State did not have such intervention as a party, and in those jurisdictions in the United States where it intervenes, it is by virtue of a positive law. See the study contained in the Monography about this particular which follows. the case of *State ex rel. Fowler* v. *Moore*, 22 A.L.R. 1101, 1112 *et seq.* (1922), views which have not been modified. The case of *Pérez* v. *León*, 52 P.R.R. 496 (1938), which the prosecuting attorney invokes to intervene, does not recognize such right.

Our lawmaker has not given the State intervention as a party or in any other manner in suits for divorce, although he has permitted intervention through the Secretary of Justice and the prosecuting attorneys in many areas which concern the family. We recognize the preoccupation of the prosecuting attorney if, in Puerto Rico, an undesirable situation of fraud has been created or is being created for the courts through nonexisting allegations of residence in Puerto Rico or for a lesser period than that required by law to the effects of obtaining a divorce here.

Probably the fact can be the product in part of the immense population of Puerto Ricans in New York City and in other cities of the United States where the causes for divorce have been very restrictive. With the recent liberalization of the causes for divorce in the State of New York (before a divorce lied only for the cause of adultery), many Puerto Ricans perhaps will not have to move to Puerto Rico to get a divorce.

■ A general situation of fraud to the court would be a deep preoccupation for the administration of justice in the Executive as well as in the Judicial Branch. The Superior Judges should be alert against such tendency, and in the hearing of divorce cases they should make sure, through the adequate examination, particularly in cases of default which are the most, that the necessary jurisdiction and venue in order to rule exist. The jurisdiction and the venue of the court to entertain an issue are the responsibility, in the last instance, of the court itself.

There is no doubt that judges can ask the cooperation of the Special Solicitors of Family Relations in that sense. And the judges should be likewise alert so that a state of deception to the court is perpetuated in these cases, requesting penalties for those attorneys who, with full knowledge that their client does not comply with the residence requisite, file a complaint where they allege the contrary, creating in this manner the deception.

■ Besides that, the District Attorneys, in their function of prosecuting offenses, are free to prosecute for perjury any person who testifies under oath in a divorce action that he has complied with a residence requirement which he does not have, since this is an essential fact whose falsehood affects the proceeding.

The State's intervention as a party in divorce suits is not authorized here by law, nor by doctrine. Conscious as we are of the seriousness which the problem of a common state of deception to the court creates, it seems to us that it is incumbent upon the Legislative Power to determine whether to grant intervention to the Commonwealth in divorce cases and how and in what manner, and under which circumstances.

It should be the Legislative Power in any event so that there is uniformity of rule and action throughout the whole country, and so as to avoid that in some Parts of the Superior

Court the Prosecuting Attorney would intervene in divorce actions, and not in others, depending on the discretion of each officer.

For the foregoing grounds the writ of certiorari issued is quashed.

Mr. Justice Rigau concurred in a separate opinion.

—O—

MR. JUSTICE RIGAU, with whom MR. JUSTICE HERNÁNDEZ MATOS and MR. JUSTICE RAMÍREZ BAGES join, concurring.

San Juan, Puerto Rico, April 15, 1970

I concur with the result of the opinion of the Court because I understand, as it understands, that the prosecuting attorneys do not have power to intervene in divorce cases. About that particular, in the opinion of the Court, the legislative power of the country is exhorted to determine whether to give intervention to the State in said cases. Said exhortation is made, I understand, because the Court is preoccupied by false allegations of residence in Puerto Rico which, it is said or assumed, are made in the courts in those litigations.[1]

Of course, I do not favor perjury in cases of divorce nor in any case but I deem that invoking legislative action on this matter of divorces should be made in order that the same be treated with a greater sense of realism and with more compassion and humanity than is done by the obsolete legislation still in force. Every divorce action is painful even when its finality is keenly desired. I do not believe that we should aggravate the mortification suffered by those grieving souls who appear in courts in these cases.

---

[1] The year of residence in Puerto Rico is not necessary when the act on which the action is based was committed while one of the spouses resided here. Section 97, Civil Code; 31 L.P.R.A. § 331. See *Mestre* v. *Pabeyón,* 84 P.R.R. 356 (1962) and *González* v. *Santiago,* 84 P.R.R. 366 (1962).

Our legislation on divorce should be modernized and humanized. In the *Memoir* of the Judicial Conference of Puerto Rico held in December 1958, there appear some proposals made by the Committee on Family Relations and Juvenile Delinquency which should be taken into consideration by everyone and especially by our lawmakers. Said Committee introduced a project about amendments to the Civil Code in the matter of divorce. In the aforementioned Conference, the Chairman of that Committee, the Hon. Antonio R. Barceló, Jr., then Superior Judge, expressed himself, in part, as follows:

"The principal defect in the present Divorce Law is that husband and wife are adversary litigants; that one should be found guilty and the other should be found innocent; that the guilty spouse should be sanctioned and the innocent spouse rewarded. In each one's effort to prove his innocence and the other's guilt, they lose respectability and decency and the proceedings can produce disagreeable sanctions. If both are found guilty, none can obtain a judgment in his favor and the marriage should continue in full force and effect, notwithstanding how damaging for the parties, their children, and society it might be.

"A divorce law should be oriented to promote happiness and not unhappiness; to procure that the litigants behave themselves in an amicable and not a hostile manner; to maintain family cohesion and not to precipitate its destruction; to see to it that the remedy claimed is grounded on the individual's right and not on another's guilt. When the husband and wife have to permanently separate themselves, they should do it without the indignities, hostilities, doubts, and aggressions which many of the divorce actions entail. The welfare of the family, and especially that of the children, should receive principal attention. This law adopts a therapeutic aspect of the divorce, and is inspired by the principle that courts should be an instrument of aid to the parties and not a combat arena. The first allegation of the moving party should be entitled 'petition' instead of complaint and the title of the case should be 'In re: The Family of —————,' instead of 'John Doe versus John Doe.'

"Let us outline the contents of this project. As we said, the remedy claimed should be grounded on the right of the individual

and not on another's guilt, with the corollary that there would be no innocent or guilty spouse. The defense of recrimination as a bar to the remedy claimed is eliminated, so that it casts aside what constitutes in our time the judicial anomaly that the divorce does not lie when both spouses have cause for the same with the sole exception of that grounded on separation.

"The causes for divorce are grouped considering them as violations to three fundamental affirmative rights and duties, that is, the law is given an affirmative instead of a negative focus; that is, the three fundamental principles of marriage: fidelity, mutual respect, and partnership, and this is defined. The remedies of legal separation and limited legal separation with their causes and the manner to determine the state of legal separation are established. The principle that the right to the requested remedy is subjected to the welfare of the children and the interest of the State is consecrated. The act of conciliation of the parties is required in all cases where there are minor children. Actually it is only required in cases of cruel treatment, grave injury or abandonment. It is not extensive to the separation. The wife is placed on the same footing as the husband in the obligations to support in harmony with the prohibition against discrimination on account of sex contained in Art. II, § 1 of the Constitution of the Commonwealth of Puerto Rico. Flexibility is given to the provisions concerning the care of the children in order that the discretion of the court in the exercise of the power of *parens patriae* may be dispensed without any inconveniences, with a view to the welfare of the minors. New remedies are created for the protection of the spouses and their rights to property in the conjugal partnership."

More than eleven years have elapsed and no action has yet been taken as to those recommendations of that Committee on Family Relations and Juvenile Delinquency of the Judicial Conference. But not long ago, at the beginning of the current year, a distinguished lawmaker and lawyer, with courage and human feeling, introduced a legislation to reform the one in connection with this matter of divorce. In his report (which we will take care of further on), before the Judicial and Government Commissions of the House of Repre-

sentatives, on February 2, 1970, Mr. Benny Frankie Cerezo quoted the paragraphs which we transcribe hereinafter of the Puerto Rican writer and lawyer, Nemesio R. Canales. We include said paragraphs despite the fact that they are written in a humoristic tone because back of that fine screen of humorism the human compassion which they entail can be noted. We believe that for that same reason said lawmaker included them in his report. Nemesio Canales, after criticizing the provision of law which prohibits granting the divorce when the parties agree to request it, wrote the following:

"You, dear sir, will find the doors of a court of justice wide open to request and obtain the dissolution of the marriage bond, provided you can allege and prove in the face of the whole world during an oral and public trial, that between you and your wife any of the eight frightful things which the Code points out as a cause for divorce has occurred.

"Any of those eight things (then there were eight)—adultery, habitual drunkenness, cruel treatment, etc.—very well proven, that is, very well brought out to public shame, well manifested time and time again before the curious eyes of the public, in the stands of a court, will entitle you to the divorce decree which you desire. But, certainly, there has to be a struggle; there must be a judicial quarrel where both spouses wash their dirty linen in public and try to cover each other with the greatest possible ignomy; there has to be one who wants to get out of the conjugal cage and another who blocks his way at any cost; there has to be one who says yes and another who shouts no. Because if you have the misfortune of reaching peacefully, without need of a scandal, an agreement or covenant by which both declare themselves incompetent to continue life in common . . . you are already doomed, and there is no divorce!

"It means my friend, that the law tells you: 'Provided you have inflicted or suffered one or more of the eight frightful things, and judicially request or are requested the divorce, it is alright; I shall grant it after the investigation and the subsequent scandal.'

"But if I happen to find out that you—both—in view of the circumstances, have had the good sense of being in agreement as to the impossibility of continuing being tied up, and have

agreed to procure the divorce in the most brief, economical, and discreet manner, then certainly I shall harass you, punishing you to continue dragging the chain for centuries!"[2]

In his cited report of February of this year the lawmaker, Mr. Cerezo, expresses himself in part, as follows:

"The superficial consideration by any citizen of the situation prevailing in our courts in relation to divorce actions would suffice to become aware of the imperious necessity that exists of adjusting the judicial rules on that matter to the social reality in which we have to live.

"Until the present time, our legal system has dealt with the dissolution of marriage practically in the same manner in which it deals with actions for damages or the breach of any contract. That is, on the grounds of a contentious proceeding where both parties submit evidence to support a series of allegations.

"The causes which our Civil Code offers as means to dissolve the bond which joins a man and a woman part from the basis that a spouse has been offended by his companion in certain areas of conduct predetermined by law. However, the first consideration in an action of this nature should not be what one person did to another, but whether the bond of affection which joined the two persons is irremediably broken, irrevocably dead. The proceeding of dissolution of a marriage should, then, be more in the nature of an investigation than of a trial. . . .

"I am vigorously propelling a measure which creates the cause of consent of both spouses or 'mutual consent' for the divorce and which eliminates the concept of guilt in this cause and in the separation for three years. . . .

"During many years I have been a witness, as all of you have been, of the farces which are daily presented in our courts in the effort made by the spouses involved in an action of divorce and the judge who hears the case, to adapt to this problem the recourses which the law has provided. . . .

"Making the proceedings for divorce more sincere and adjusting them to reality does not impair the importance of marriage. The basis of the stability in the home is not the marriage as a civil institution or as a judicial or ecclesiastic

---

[2] *Paliques*, p. 173, *Editorial Universitaria de Puerto Rico* (1952).

decree. The basis of stability in marriage is love, understanding, tolerance, and mutual respect between the spouses. Therefore, the primordial thing in marriage is not its invulnerability as a contract.

"If a married couple, after a serious attempt to harmonize their relations, finds out that conjugal life is not possible any more, that they live spiritually divorced, why should they keep on pretending? Perhaps they could dissolve that marriage within a harmonious climate, but pursuant to our Code, they have to resort obligatorily to an adversary proceeding where they face and consecrate each other as enemies. The law expressly prohibits them to come to an agreement in order to end a relationship whose only raison d'être does not exist any more. The idea is that, in hearing the allegations of both parties, and the testimony of witnesses who hardly ever know the issue involved, as the facts occur generally in the intimacy of the home—the court has sufficient elements of judgment to determine who is the guilty spouse and who is the innocent one.

"However, that same law which demands 'guilt' in one of the parties and 'clean hands' in the other, accepts recrimination as a defense and allows that in a complaint which has not been answered, one of the parties only may introduce evidence to establish the facts which have given rise to the cause. And we all know that reasons exist, many of them foreign to the guilt, for which a spouse prefers not to answer a complaint in a divorce action and to be considered therefor guilty, instead of publicly facing a judicial proceeding of this nature.

"The concept of 'mutual consent' deals with the divorce giving the parties the opportunity of settling their differences in an atmosphere of relative harmony within an irreconcilable situation. In the cause, as well as in the separation for three years, the concept of guilt is erased.

"This concept, which, as we have said, is the product of an adversary system, requires the testimony of the parties. This testimony may become bitter and damaging and leaves, generally, great residues of hostility between the divorced couple, seriously affecting the children, who by virtue of those testimonies, assume attitudes in favor or against their parents. . . .

"What is important, then—is not to save a marriage which is already destroyed. That would only result in a greater disorientation in the family. A child who lives with parents who

are constantly recriminating each other cannot be happy; a youth who lives in an atmosphere of disdain and hate cannot grow up with the idea that marriage is good.

"What is important is, that although two persons have in any manner violated the relationship which joined them—the life of the children can be saved reorienting it towards a new type of paternal relationship which allows an understanding of the human elements which have brought about the separation. . . .

"We believe that the project which we have filed represents a step forward in that direction. In the first place, the concept of guilt in the cause for separation for three years is eliminated. If what only has to be proven to the court is the objective fact of the separation, there is no reason why one party has to be branded with a guilt that has not even been established.

"In the second place—we repeat—the cause of 'mutual consent' is added. It has been said that this cause constitutes an open door for divorce. Nothing is farther away from the truth. The ones who support this have not read carefully the project of law filed. The cause is not easy. It seems to me that it is the most difficult and the one which guarantees with more certainty the welfare of the children.

"In the first place, it demands that the spouses be in agreement. It suffices that one of them refuses in order for this cause not to exist. Moreover, first class evidence should be offered to the court to establish that the necessary measures to safeguard the welfare of the children have been taken. This includes boarding, support, custody, potestas, and other relationships—everything, of course, in accordance with the economical status of the parents.

"In addition, from the filing of the complaint, six months should elapse in order for the divorce to be granted—period which gives rise for a possible reconciliation. . . .

"This clamor to humanize and bring nearer to reality the proceedings for divorce has found echo in other jurisdictions. Some have gone further than what we intend."

We have cited the foregoing three authors because they make sincere and well-intentioned contentions. The pronouncements cited are, we believe, representative of that "clamor to humanize and bring nearer to reality the proceedings for

44

divorce" which is noted everywhere. We have not pretended to offer final solutions here but we deem, as we said before, that if the legislative power is to take action about this matter it should be to modernize and humanize it, not to make it more cruel.